In our final case, Moretti v. Thorsdottir, Mr. Migattauber, you're representing the plaintiff. Yes, sir. Good to have you with us, sir. Thank you, Your Honor. Good morning, and may it please the Court. My name is Alan Migattauber, and I represent the appellant, Mr. John Scott Moretti. Under this Court's 2007 decision in Miller v. Prince George's County, it is clearly established that an officer cannot lawfully make intentionally or recklessly false material statements or omissions in order to obtain a warrant. Any reasonable detective would have had reason to doubt the identification made by the victim in this case and would have informed the magistrate of the conflicting identifications, as well as her failure to corroborate any part of the victim's story. Detective Helga Thorsdottir engaged in malicious prosecution under both the Fourth Amendment and Virginia law when she swore out a warrant based on two facts. First, the victim's ID, and second, that my client had a gun in his home. Courts have held that a victim's ID can be enough if the victim is reliable, but it may— The victim did identify an appellant twice by name, and he did have a gun in his home. Yes, Your Honor. So those facts are accurate, it's just you don't think that was enough for her to have gotten an arrest warrant. No, Your Honor. We think that she withheld vital information, that when she identified my client, it was not her first identification of her abuser, and that a year prior, she identified somebody who was her father's friend and living in her home at the time. Right. Did this officer know about that? Yes, she did, Your Honor. Where can I find that in the record, that the officer knew about that prior identification? We alleged at J&A pages 8 and 9, paragraphs 23 through 27, and that the detective— Oh, wait, is that your—okay. And then in our complaint at paragraphs 26, 27, 125, 142, and then in 115, 17, and 18, and JA 42 is the detective's write-up where she describes her summary of the earlier Alfaro report where the detective said that he had received that—the identification. Right, and did she have that summary at the time of the arrest warrant? She had it two years before—a year before the arrest warrant, Your Honor, yes. The arrest warrant was sworn out in May of 2020. Detective Thor's daughter had that information in September of 2019 when the case was referred to her. And that's on JA—what did you say? That's JA 42, the detective's write-up of the summary of the report she had received from her supervisor. So we believe that—so yes, so she made—again, so the victim, I did ID my client, and yes, my client owned a firearm like 44.6% of all Virginia residents, and my client— Right, he was an officer, so— Yes, so there's about a 1,000% chance that he was going to own a firearm. Right. More importantly, they don't identify the kind of firearm. At the time of the allegation, it was six years before, and she identified—the victim identified that my client had a handgun. He is prepared to testify that at the relevant time he only owned long rifles, and that while the search of his house may have uncovered a handgun six or seven years later, that does not indicate that he had a handgun at the time and would not be probative of the decision. But most importantly, we think there were three facts the detectives withheld from the magistrate judge that would have undercut probable cause. First of all, the initial interview that was withheld from the magistrate was incredibly problematic, and the victim was told that she could only leave this five-hour interview if she named her abuser. We think that is coercive and was an inappropriate means of getting an identification, and even the detective supervisor, First Sergeant Tyrell, expressed concern about the interview, and that was in her email at JA-54. Secondly, perhaps most importantly, the prior inconsistent identification. When she was calling or communicating with a suicide hotline, the victim in this case identified her abuser as a friend of her father's and someone who at the time was living in her home. Those two facts were absolutely available to Detective Thor's daughter when she swore out the warrant. What we have found out subsequently is that her ID was far more specific. This was not a case of a young girl mistaking friend of my father and my friend's father. She identified him as her father's best friend since high school, the best man at her parents' wedding, and somebody who had attended another wedding with Jane Doe's family. We think that's enough to absolutely have identified that that information would have been available to Detective Thor's daughter if she had but sought it out, and she failed to do so. She never made any attempt, as far as we can tell from the record, to try to track down this chat transcript, which my client's criminal attorney was able to... Okay, so she didn't have the chat transcript at the time. Not the chat, not the full transcript, no. She had a summary of it that was called in to the police, but we believe it was reasonably available. I see. So she didn't have the chat transcript until after the arrest warrant. Well, as far as we can tell, that's correct. We dispute, we think it's possible she had it earlier, but certainly that under this court's cases, she should have sought it earlier because it was reasonably available to her, and that it would have been very easy, Judge Thacker, for her to have... She certainly had enough probable cause to get a search warrant for my client's home to search for child pornography. She would have had enough to get a subpoena for this chat transcript, and if she had done so, this case would have ended immediately. And the fact that these were material omissions, you are in an enviable position that you don't have to guess or create a counterfactual. Here we have another reasonable police officer, the detective's own supervisor, who told her, this idea is shaky. We have Assistant Commonwealth's Attorney Lowe, who when she was provided with a copy of the transcript, no-load this prosecution. So we know for a fact that information was material because people who had access to it had reason to doubt the probable cause in this case. Our third and final thing that we think the detective should not have withheld from the magistrate, but she did, was a prior disproven charge that my client created child pornography of the victim. In the same interview in which she disclosed the sodomy, which was the basis of the warrant, she said that my client used a small silver camera to take inappropriate pictures of the victim. The detective got a search warrant. She searched three cell phones, five laptops, three tablets, SD cards and thumb drives, and found no evidence that my client possessed or created child sexual abuse material. In her affidavit for that search warrant, she testified that in her expert opinion, as a detective who investigates sexual crimes, people who create child sexual abuse material hoard sexual abuse material. So the fact that the victim in this case claimed my client had created such material and they found no evidence in the exact same interview as the charge underlying the arrest warrant, we think that is probative and valuable information that the magistrate would have relied on to undercut probable cause. But beyond just withholding information, there actually is one affirmative misrepresentation in the warrant in that it identifies the victim as 18 years old, which was true at the time the warrant was sought, but was not true at the time the accusations against my client were made. She was a minor, and there is a consensus of cases throughout the courts of appeals that have held that a bare allegation alone by a minor without some corroboration is not a probable... ..does not create probable cause. Instead, it may raise reasonable suspicion and would lead a detective, a reasonable detective, to conduct an additional investigation, which Detective Thor's daughter did here. But in seven months of attempting to corroborate the victim's story, the only thing she found that corroborated anything was that my client owned a gun. And again, you flip a coin and search a Virginian's house, you're going to find a gun. At this point, Your Honours, if you have no further questions, I really... So it seems to me you're asking us to find that there's no probable cause based on evidence that the detective could have obtained but didn't. So specifically you're talking about the chat transcript. She could have accessed it, but she didn't. And as I read our case law, our cases say exactly the opposite, that the detective doesn't need to obtain all evidence as long as there's enough evidence to form probable cause. First of all, Your Honour, Judge Werner, I would say first, I would think that we are asking you to reverse it based on just the pure existence of the alternative ID which the detective had in her possession. But secondly, I would argue that... OK, go ahead to your second point. Sorry, my second point is that Savini v. Dixie, this court's 1988 decision, held that an objective inquiry must charge the officer with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstance. So we're not saying she has to pursue every potential exculpatory lead. But if you get a referral that, hey, a victim called the suicide hotline and in a chat transcript identified her abuser, I would think a reasonable officer would want to see the text of the transcript and not rely merely on a summary. Well, it said... You call it an alternative ID, but all it says, all that she had in the summary, is that she had disclosed that she was molested by her father's friend and then the victim was told, when you're ready to disclose, contact the police department, and then fast forward to the point where the officer talked to her and she disclosed a specific name twice. Yes, but that name was inconsistent with the fact she had previously disclosed, which the detective had. It wasn't just her father's friend, which he, by the way, volunteered. She didn't even ask the victim's father, is Mr. Moretti your friend? He had to volunteer that information during his interview and he categorically denied that that description was accurate. The victim and appellant's daughter were friends, correct? Correct, yes, that is true. But the other thing is she disclosed, as we've alleged she disclosed as part of that transcript interview, that the abuser was living in her house at the time she made that call. That categorically does not apply to my client. And so the detective would have had reason to believe that when she identified my client as her abuser, that that was not perhaps the correct identification. In fact, there is reason to believe that the identification she made in 2017, or the earlier identification, is more accurate in that she was disclosing it to a suicide hotline. So that's indicative that she wanted this to be the definitive statement of who abused her. She thought that she was not going to be around to suffer the consequences. Does the summary say that the abuser was living in her house? Or does it just say it was her father's friend? The summary says that he was living in her house. Well, that's what we've alleged in our complaint. At this time, we're at 12B6, we're entitled to an assumption that all the well-pled facts are accurate and true and take all... Even if I'm looking at the summary and I don't see where it says that? Let's see, Your Honor. Maybe you could just tell me where it says that. I'm trying... Okay, let's see. That's JNA 8-9, paragraphs 23-27. Wait, that's your complaint? That is our complaint. I'm looking at the summary itself. You said that the summary said not only that it was her father's friend, but that he was living in her house at the time. I don't see that in the summary. I believe that's in Detective Alfaro's report on JA35, which is what Detective Thurr's daughter was summarizing on JA42. Okay. It says it was her father's friend. It doesn't say the person was living in the house. No. Wait. No, it does. Now living in the home again. You know, it's an odd posture because we have your complaint and then we have these documents attached to the complaint and some of them at least seem to favor the defense. And so I guess I'm struggling with how we weigh the statements in your complaint that conflict with the documents that are attached to your complaint. Well, Your Honor, I would argue that's an excellent reason to let us go to discovery. We're not even at summary judgment here yet. This was a 12B6 motion to dismiss. But you can't... So you're saying that you can say whatever in the complaint even if it's inconsistent with the attachments to the complaint and you get to go on with discovery? No, Your Honor. I guess at that point... You can't be right. Well, I guess the appropriate remedy then would be to send us back to amend our complaint to make sure that our complaint matches the facts that we've attached and let us amend the complaint and try to make it more correct. But in either case... I believe our case law says that the exhibit prevails when there's a conflict. Well, then, in that case, Your Honor, I guess I would credit... Again, I would credit then the exhibit, but as I just said, the exhibit does show in Detective Alfaro's report, which is what the Detective Thor's daughter was summarizing in hers. And is Detective Alfaro's report attached to the complaint? I believe it is, Your Honor. I believe that's JA35. That's the one. Yeah. Okay. So we think this case is very similar to Wesley v. Campbell from the Sixth Circuit. There, you had an accuser who had psychological and behavioral problems. This case first came to Detective Thor's daughter by a residential therapist who was treating the victim in this case. Like in Wesley v. Campbell, there's evidence that they were never alone. My client told the detective that he was never alone with the victim. His children told the detective he was never alone with the victim. Had the detective reached out to my client's ex-wife, she would have told him he was never alone. And I don't know about you, Your Honor, but if I want dirt on someone, my first stop is going to be the ex-wife. So the fact that the detective never even completed an interrogation or an interview with the ex-wife when she had indicated she was willing to speak with her seems like reasonably available information that a reasonable detective would have pursued. So again, the key here is that there were reasons for the detective to objectively and subjectively doubt the accuracy of the allegations here. And she never took any steps... Well, she took several steps and couldn't corroborate any of the evidence or the accusations and took no steps to identify anyone else. In fact, as far as we can tell, the Commonwealth has never pursued whether or not the best man at the victim's parents' wedding is the abuser. As far as I know, and the Commonwealth is welcome to come up here and correct me, they have not pursued a case against the person who has now been definitively ID'd as the other potential abuser here. And so for that reason, we would ask that you remand this case to the lower court so that we can proceed to discovery. Thank you very much, Your Honor. Thank you very much. You've saved some rebuttal time. Ms. Mooney? Good morning. May it please the court, my name is Tara Mooney and I am appearing today on behalf of Prince William County Police Detective Helga Thor's daughter. She is present today in the courtroom, seated behind me in the first row. This is a case about probable cause established by a victim eyewitness's identification. The precedent in this circuit, Torchinsky, says it's difficult to imagine better evidence, better probable cause evidence, unless the officer were to witness the crime herself. The amended complaint is a frivolous lawsuit... Except that the appellant never lived with the victim and the appellant wasn't friends with the victim's father. I'm sorry, I'm happy to address that, Your Honor. If you look at what was pointed out to you by counsel for Mr. Moretti, JA35 and JA36 is the Detective Alfaro report that he drew your attention to. And yes, at the bottom of JA35, it talks about the statements that were attributed to Jane Doe, not her statement to the police. It's the statement attributed to Jane Doe. Right, it is different where she directly told the officer twice, appellant by name. Agreed. However, what about opposing counsel's argument that the officer should have at least sought out the chat transcript to do a more full investigation? I'm happy to answer that, Your Honor, but let me also add on JA36, Detective Alfaro, there was a forensic interview that took place. In Detective Alfaro's report, specifically, she declines to answer questions about it, but when asked specifically, is the abuser living in your home, the answer was no. So when she's talked to directly by Detective Alfaro in that report... Wait, that's on JA36? JA36. So JA35 is where the statements attributed to her... Right, I want to see in the next to the last paragraph. Yes, Your Honor. Okay. She denies that the abuser is living in the home, and she says nothing else about, and never names that person in that earlier time frame of between 8 and 12 years old she was subject to abuse. That was the earlier complaint that was referred to the police, but when she was talked to directly, her direct statement was, I don't have anything to say about this, basically, and then also, nobody's living in my home who's my abuser. Nobody's currently living in her home who's her abuser. The question was, is the alleged abuser living in your home? She says no. That was the direct answer to police that she gave at the bottom of JA36, the Detective Alfaro report. So I'm sorry. Was that an answer to your question? Because I'd be happy to talk more about this. Right. My question was about why she didn't seek out the actual chat transcript itself. I'm not sure she knew that there was an actual physical document somewhere that had a line-by-line chat, for example. But I will also say to Your Honor that in the allegations here, it is certainly not plausibly alleged on its face that she had that hotline transcript in her possession. In fact, it was conceded by counsel at the district court level in front of the judge on the motion to dismiss counsel at that time conceded that we know that she did not have it. We believe she did not have it in her possession, the chat transcript. I don't think the argument is that she had it. I think the argument is that she should have made an effort to obtain it. Right. Your Honor, I appreciate that. I would say to Your Honor that the law does not require her to chase down every exculpatory lead, every possibly relevant piece of evidence in the case before probable cause is established. And so the law doesn't require her to go get that. And the summary says that at the time the family was advised to contact the police when she was ready to disclose. And then when she did disclose to the officer, it was appellant's name twice. Now, that was wrong, but that's the information that was provided to the officer. I'm sorry. Appellant's name twice. What was wrong? I'm sorry. It wasn't him. Who wasn't him? I'm sorry. Appellant was not the abuser. You dismissed the complaint against him. Oh, I'm sorry. I'm sorry. Do you know who the? The Nolpross happened when, if you look at the JA88, it is I, Exhibit I on their amended complaint. It is the letter from. I know it happened after the chat transcript came to light. I was just pointing out that it, I think, is helpful to the officer, even though very unfortunate. I think it's helpful to the officer that the victim identified the appellant twice by name. I was merely making the point that this was too long, that he had to be under an investigation for something he did not do. Oh. Well, I assume the state thinks, at least they could not prove it because they dismissed it. That's actually, I don't believe that's the reason why the case was Nolpross. The case was Nolpross, according to my understanding, and when you see Exhibit I, which was attached to the amended complaint, the prosecutor Nolprossed the case because of her unwillingness to move forward with the case. Because the victim's unwillingness to move forward with the case. Yes, Your Honor. Jane Doe no longer wanted to move forward with the case. It had nothing to do with the chat transcript. My understanding is that the decision to Nolpross had to do with her desire to no longer move forward with the case. What J.A. were you pointing to? It's J.A. 88. Okay. Yes, Your Honor. Okay. So the amended complaint is a frivolous lawsuit properly dismissed by the district court because the plaintiff failed to allege facts to state a claim that is plausible on its face. Detective Thor's daughter also is entitled to qualified immunity. Probable cause really is at the heart of this case. It is essential to the case. It is a low bar, as the court knows, but it's the totality of circumstances we're allowed to use common sense, we think about what is human nature. It is important for the court to note that there were not lies or misrepresentations to the magistrate when Detective Thor's daughter went and obtained the felony warrants. Hold on, I'm sorry. Yes, Your Honor. That's the J.A. 88. Yeah, at the end it says the victim's no longer willing to go forward with the prosecution, and I can understand why after all of this. But the very first thing in this J.A. 88 as the reason says, I've been made aware of the falsity of an argument that I made during the motions regarding the victim's medical records in this case. I previously believed that in 2018 the victim had not named another individual as her abuser for the pending charges and argued as such. But then these messages clearly show the victim naming another individual. That is the reason it was not prosecuted. You said it was only because the victim is no longer willing to go forward. That may have been one reason, but you clearly gave me the impression or wanted to give me the impression that the victim being unwilling to go forward was the only reason it was not prosecuted, and that's clearly not accurate. Your Honor, my understanding is that... I'm looking right at it. I don't know why you pointed me to it. Your Honor, my understanding, and this was discussed in front of the district court with the motion to dismiss hearing. Judge Giles read this the same way I read it, which is that the null process was because of the victim's desire to no longer go forward with the case. So I didn't certainly mean to mislead, Your Honor. It's what I believe is accurate and is how I interpret this. I think the first part of that is her trying to let the court know about something that she doesn't certainly want the judge to have a misimpression of something she said earlier in the case. But the null process has to do with the victim's desire to not move forward with it. And if you look at the early conversations between the assistant commonwealth's attorney, Lauren Pomerantz, who was the initial prosecutor on the case, ACA Elena Lowe only came into the case in January of 2021. So the initial prosecutor in the case was assistant commonwealth's attorney, Lauren Pomerantz. And that's something that may not be clear to the court, but that is what is true, and it is also in the documents that are attached. Let's go back to the time that the officer got the arrest warrant and the information that she had. Maybe you could just lay that out. That made it reasonable that she did that.  So, Your Honor, she went forward with the warrant for arrest and asked for the warrants. Based on May 5, she has a statement, there's a sworn statement, that the victim has disclosed to the affiant, which was true, that while she was repeating the ages of 10 and 11, and that's a subset of what is in Alfaro's report. Alfaro's report says 8 and 12. Between ages of 10 and 11, the suspect identified as John Scott Moretti put his penis in her mouth. During the incident, Jane Doe stated that she did not want to and told Mr. Moretti that she could tell her parents and it would stop. Suspect retrieved a handgun, put the gun to her head, told her how easy it would be to pull the trigger and kill her and her family. Afterwards, she complied, and the suspect put his penis inside her mouth. During the search warrant of the suspect's residence, multiple firearms were observed. These acts occurred within Prince William County. Those are all true statements, and they supply probable cause. So this criminal complaint was a true statement, and there are no lies here that she's made to try to obtain falsely. And they're arguing that the omissions are the problem, that she omitted that the victim had reported that it was a family friend. What's your response to that? Your Honor, my response to that is that they have not alleged facts that are plausible on their face. If you look at paragraph 93 of their amended complaint, it has a laundry list of items that they have alleged should have been brought forward. We have to look at what's actual knowledge in her possessions at the time she went to the magistrate, so May 5, what she actually knew. And Detective Elfaro's report, certainly there's evidence that she had opportunity to read and reflect on and see Detective Elfaro's report, which said a statement that was attributed to her by a referral that she said it was the father's friend, not her friend's father, which is an unusual word reversal if you think about it, because in this case she was close friends with his friend. This man was her father's friend, so it's a unique word reversal, which is confusing, but perhaps that has a game of telephone here because these are statements attributed to her in 2018. In any event, her statement to the police when she's actually brought in and interviewed was, I don't want to discuss this, and nobody's living in my home. That was the abuser. So what you have, if you read together what is alleged to be in her knowledge and insert that into the criminal complaint, then the question becomes, does that negate probable cause? Is the fact that somebody said that she said to a chat hotline in 2018 that her father's friend had sexually abused her between the ages of 8 and 12, if you were to add that to this probable cause statement, J.A. 78, do we negate probable cause? And I'm going to say no, because they both could be true. It could be true that her father's friend abused her between the ages of 8 and 12. That could be true. And it also could be true that John Scott Moretti forcibly sodomized her at gunpoint. Those are different statements. One does not negate the other. And there could be more than one abuser in her life. As the court well knows, it is not uncommon that a child may have more than one abuser in her life. But clearly she states John Scott Moretti was her abuser in this five-hour interview, very clearly to the detective. Can we talk about the interview? I think that, I mean, I found the procedure followed in the interview deeply disturbing, at least as alleged in the complaint. The fact that it was five hours, an interview with a child victim, the actions of the therapist were shocking during the interview, and the suggestion that the victim was forced to sort of make a statement about who abused her and forced to do that if she were to be able to end the interview, which sounds in and of itself rather abusive. And so I guess I question whether relying on those statements was reasonable in and of itself. Thank you, Your Honor. I would say yes, it was reasonable to rely on those statements. It was very clear in her statement to, during that five-hour interview, she very clearly identified John Scott Moretti as her abuser. It took her a while to get there. That's not uncommon, that child abuse victims, child sexual abuse victims have— Is it common to interview a victim for five hours? I don't know that that is an appropriate amount of time. I don't know that the court has ever put a specific amount of time on how long a child interview can be conducted. So I understand the question Your Honor is raising. I think that is something to be explored at a trial. That is information that they could talk about in front of a jury and try to impeach her statement, for example. That's a credibility issue that would be resolved in front of a trial. It is not something that would be discussed in front of a magistrate when you're asking for a probable cause warrant. And there's no precedent that I'm aware of in the circuit that says that she has to talk about exculpatory material the way you're describing. If you look at Coakley, I would suggest to this court, Coakley is very much on point with this case. And it specifically says in Coakley that the officer is not expected to come in and provide every piece of information, every fact of her investigation to the magistrate. It's not reasonable. It's not practical. It's not what the Constitution requires. Exculpatory information, what you're describing, Your Honor, when you talk about the details of the Moretti disclosure in the five-hour interview, that's something that would be discussed at trial. But it's not something that this court, this Fourth Circuit has ever required to be contained in a probable cause statement given to a magistrate. Well, if it was plausible and you're saying it should have gone to a jury, then why was 12B6 appropriate? I'm sorry, Your Honor. I mean jury, meaning when the person was charged. You said repeatedly that these were facts that would be appropriate to go to a jury, an argument that should go to a jury. I mean a criminal jury. I mean if this case had moved forward and not been null pross, those were issues that would be explored in front of a criminal jury if this person had stood trial. That's what I'm saying. In state court, I'm not talking about the 12B6. 12B6 was appropriate. I'm sorry if that was confusing. I apologize. Was the magistrate told that there was no child sexual abuse material located in the search of all of the cameras and things and computers? I don't know the answer to that, Your Honor. What is on the affidavit does not include that. So I don't know specifically if she verbally discussed that with the magistrate or not. But it was not on the affidavit. It's not on the affidavit. I will concede it's not on the affidavit. Why isn't that an important omission? Because it would have corroborated, if it had been accurate, if they'd found something, it would have corroborated the victim. They didn't find anything, so it didn't corroborate the victim. Well, the absence of evidence, I'm going to suggest to the court, is not something that would have been needed to be discussed with the magistrate. And it's not really surprising. Except that in the officer's experience, these sorts of perpetrators hoard child sexual abuse material. It's very unusual not to find something. So, Your Honor, I would tell the court that in this record, we know that this detective contacted him on November 7. And then on November 11, there was a search warrant of his home. And by him, you mean appellant. Yes. And so you're suggesting that there were four days in which the computers and things could have been wiped. Yes. Was there any forensic analysis done of those? Because, I mean, you can't, you generally can't just delete everything forever. You can find some remnants, usually. Sure. So there was a forensic analysis that was attempted in this case, that is true. And nothing, according to what's in this record, nothing of value was found in the forensic analysis of those. Usually in the forensic analysis, if something is, if there have been deletions made or programs run to get rid of things, you can tell that, too. Was any of that, did any of that appear? I don't know the details of the forensic analysis, Your Honor. I'm sorry. And neither does the magistrate judge because it was omitted from the affidavit. It's not in the affidavit. I will tell Your Honor that there was, like you said, from November 7 being contacted to November 11 when they went to the house, there was time in advance that he would have known that the police were. I mean, he could have just gotten rid of the computers altogether. True. That may be, that could have happened. He also worked for the State Department, and a search warrant was done at his home. It was not done at his office. There's no evidence of that. It wasn't done at other places where he had access to. And so the fact that they didn't find any images of this child when she said it happened many years ago, right, many years ago, didn't happen close in time to the disclosure. And as the court knows, delayed disclosures are not uncommon in child sex abuse cases. The fact that they did not find images of this child does not mean it didn't happen, does not mean that he didn't take these images of her or that he didn't have them at some point. So I appreciate the question, Your Honor. But again, if you look at what's contained on the probable cause statement that was given on May 5, 2020, by Detective Thorsauder, it does state probable cause, and she went forward and presented this probable cause properly. There is no plausible allegation here that she had the requisite intent to commit a violation of his constitutional rights. She did not have the intent to mislead the magistrate, Your Honor. And it's not plausibly alleged here that she had the intent to mislead the magistrate. She consulted multiple times with her first sergeant. She consulted multiple times with the Assistant Commonwealth's Attorney, Loren Pomerantz. I'm sorry, Your Honor. I see that my time is up. You finished your thought period. She consulted multiple times with the Assistant Commonwealth's Attorney, Loren Pomerantz. And so she had these conversations with him on multiple occasions and conducted a seven-month investigation before she obtained the felony warrants, which she had a probable cause to obtain. And her actions were proper based on Torchinsky and Coakley. We ask this Court to affirm the ruling of the District Court. Thank you so much. Thank you very much. Mr. Mica, however, you've got some rebuttal time. Thank you, Your Honor. Judge Thacker, we read JA 88 the same way you do, and we ask for nothing more than the ability to depose the ACA law and ask her what her intent was in writing that letter to the Court. But we also think it indicates that there was more withheld than even we thought in that she indicates that she was never aware that there was an alternative ID made in 2018. And we know the detective was aware that at least there was somebody identified as the father's friend that would undercut the identification. Someone reading JA 78, the affidavit attached to the search warrant, would absolutely be justified in thinking that a young woman, age 18, walked into the police precinct, testified that she had been abused by my client, that they conducted a search warrant and found a gun. But that's not what happened here. There was a seven-month investigation. There were forensic searches of computers. Nothing, except for the fact that like nearly half of all Virginians, my client owns a firearm, was found to corroborate the identification made by a minor. Even reading the affidavit, you would think this was an adult who walked in and made these allegations because it identifies the victim as 18, which is true on the day the warrant was asked for. Not true at the time she made the allegations. And like you said, Judge Berner, we have serious questions about that interrogation. It was five hours long. The therapist played an unduly coercive role in it. And the victim was told she could only end this five-hour abusive ordeal if she named an abuser. And so in desperation, we believe, she named my client. She was looking for a way out. She didn't want to destroy her family by saying it's my father's best friend. And so our theory of the case is she picked someone convenient, and that just happened to be my client. Now, yes, it's true. Detective Thor's daughter did consult with First Sergeant Tyrell. And First Sergeant Tyrell said, you don't got it. That's J.A.'s 53 and 54, the email where she lays out seven separate investigatory steps for the detective to pursue. And she even concludes that letter by saying, we have to go out with the idea that it may not be Mr. Moretti because she said, I have problems with this interview. She's another reasonable officer. And that is what distinguished this from Torchinsky, is that in Torchinsky, the supervisor corroborated the detective's judgment that he had probable cause. Here, she undercut it. She said, I don't think you have probable cause even for a search warrant, let alone an arrest. And while technically those are the same standards, we know that judges are probably a little easier on search warrants. I see I'm out of time. We would ask you to reverse and remand that we can go to discovery in this matter, unless you have further questions. I just have one more question. Your friend suggested that you would need to prove intent to mislead in order to prevail. Is that – do you agree with that? No, Your Honor, we don't. We think the case law shows that the mere failure to – the omission or inclusion of evidence that it was false or misleading with reckless disregard of whether or not it would be false and misleading, that's the standard here. There is a reckless disregard standard in cases like Miller, in cases like Clipper v. Tacoma Park. So it's enough to say that she acted with reckless disregard as to whether or not – but also we would argue that the mere fact of searching for a warrant without probable cause, that is – that would be evidence of malice. And the fact that they've never pursued this newly they received is also, we think, evidence that they had it out for my client, if that was necessary. But we don't think it is. Thank you. Thank you very much, sir. We appreciate counsel's work. We'll take the case under advisement. As a matter of fact, we'll take all of them under advisement. And Madam Clerk will return court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, Stephanie D. Thacker, Nicole G. Berner